# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

JOHN MANCHESTER,
     Plaintiff,


v.                                              CIVIL ACTION NO. 13-11981-MPK


CITY OF AMESBURY, ELIZABETH
McANDREWS, in Her Individual and
Official Capacity, THOMAS CONNORS,
in His Individual and Official Capacity,
and ROBERT WILE, in His Individual
and Official Capacity,
     Defendants.


## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#36).


KELLEY, U.S.M.J.

     The parties have consented to having this case heard by a magistrate judge. (#33.)  This suit

is the result of a sad series of events in the City of Amesbury, where school administrators delayed

allowing parents to air their grievances about the sports program, and one parent who did complain,

the Plaintiff here, ended up facing criminal charges in the Newburyport District Court, charges that

were eventually nol prossed and dismissed.  Plaintiff  alleges civil rights violations by Defendants

Elizabeth McAndrews (athletic director and dean of students at Amesbury High School), Thomas

Connors (the basketball coach at Amesbury High School), and Detective Robert Wile of the

Amesbury Police, in both their individual and official capacities, as well as the City of Amesbury.[1]

---

[1]

     The Amesbury School Department, the Amesbury Police Department, and Lesley Murray were
formerly named as defendants, but were dropped from this litigation. (*See* Order, #11; Stipulation of

(#1 at 2.)   Manchester, a parent at Amesbury High School, asserts that he merely complained to Coach Connors and Athletic Director McAndrews that Coach Conners was not doing a good job coaching the basketball team, and should step down.   Connors, McAndrews, and Wile assert that Manchester did not merely complain, but actually threatened Connors that he and other parents would "go public" about possible criminal charges - larceny (of money from team members) and assault and battery (for hitting a player) - and that such publicity would be "ugly" and would cause Connors to lose his livelihood, unless Connors gave up his job as basketball coach.   Plaintiff Manchester met with McAndrews and allegedly repeated these threats to her.   As a result, Detective Wile filed charges against Manchester for extortion, threatening to commit extortion, and intimidation of a witness in the Newburyport District Court.

In Count I of the complaint, Manchester charges that Defendants "individually and as a group" attempted to prevent him from exercising his First Amendment rights of "redress and petition" concerning "the behavior and employment status" of Connors, and that attempts to petition the municipal authorities were suppressed by criminal charges being brought against Manchester "without probable cause of any kind."   (Complaint #1 at 7.)   Count II alleges a violation of Manchester's First Amendment right of expression for the same reason.   (*Id*. at 8.) Count III charges that   Manchester's Fourth Amendment rights were violated by "the participation by all the Defendants in the attempt to create the appearance of probable cause for a complaint," alleging that "the intentional imposition of a criminal complaint, conditions of pretrial release, compulsory process necessary of a defense [sic] and the social and community implications [sic]" for Manchester and his family were an unreasonable seizure.   (*Id.*)   Count IV alleges a violation of due process

_____

Dismissal, #24.)

under the Fourteenth Amendment because of "the participation by all the Defendants in the attempt

to create the appearance of probable cause" and Count V alleges a violation of Manchester's rights

under Mass. Gen. Laws ch. 12, § 11H, because of the "participation by all of the Defendants in a

scheme to threaten, intimidate and coerce" Manchester "for the purpose of preventing him and

others from complaining about the personnel of the municipality and the school district."  (#1.)

Defendants moved for summary judgment. (Motion and Memorandum in Support, ##36, 37.)

Plaintiff opposes the motion. (Opposition and Memorandum, ##39, 40.)    As set out below, the

decision on the motion for summary judgment turns on the narrow question of whether Detective

Wile had probable cause to apply for the complaints against Manchester.  For the reasons that

follow, the Court finds that he did have probable cause, and Defendants' Motion for Summary

Judgment should be allowed.

I.      BACKGROUND

During the time relevant to this lawsuit, John Manchester lived in Amesbury, Massachusetts,

and his son was a freshman at Amesbury High School. (Defendants' Statement of Material Facts,

#38 at 2 & exh. 1 at 6-7, 27-28, 34.)[2]   When his son was younger, Manchester was the parent coach

of his son's middle school basketball team. (*Id*. exh. 1 at 34.)[3]

In Spring 2011, members of a parent organization called "Restore Amesbury Hoops"

approached Manchester with concerns about Amesbury High School boys' head basketball coach,

---

[2]

    Unless otherwise noted, the parties agree on the facts stated. (*See* Plaintiff's Response, #41.)

[3]

    Manchester and his family moved to Wisconsin in about July 2011, soon after he was charged with the crimes that are the subject of this lawsuit. (#38 exh. 1 at 6, 144, 159.)

Thomas Connors.[4]  (*Id*. at 2-4 & exh. 1 at 31, 40.) They complained that Connors was abusing student players, both physically and mentally; that he had stolen money from the players; that he showed favoritism toward his own son, Thomas Jr.; that he was not performing well as a coach; and that he would retaliate against players if confronted about these issues. (*Id*. at 2-4.) Manchester was not a member of Restore Amesbury Hoops, and his son had never had Connors as a coach. (*Id*. exh. 1 at 30-32, 36.)  Manchester thought that the group members contacted him because he had been a successful middle school coach, and because his son might be coached by Connors in the future.[5] (*See id*.)

In March 2011, some of these parents contacted Elizabeth McAndrews, the high school's dean of students  and athletic director, by email, requesting a group meeting to discuss their concerns. (#38 exh. 7 at 3-4.) McAndrews replied that they would have to meet  individually in order to protect each student's privacy. (#1 at 3 & exh. 3; Answer, #7 at 3; Plaintiff's Response, #41 at 2.) She also told them that, because it was a busy time of year for the sports department, the meetings would have to wait until April 25, 2011, following the April break. (#38 exh. 7 at 4.)

In April 2011, before any meetings took place, Connors sent an email to Manchester, asking for a meeting to discuss whether Manchester would like to coach the summer varsity boys' basketball team. (*Id*. at 2 & exh. 1 at 43-44.) They met at the high school on April 13, 2011. (*Id*. at

---

[4]

Connors was also the head football coach and taught physical education at the high school. (#1 at 2; Answer, #7 at 2; #38 exh. 1 at 40.)

[5]

The group posted a memorandum on its website listing concerns about Connors, including improper handling of money, poor performance, his failure to inform two players that they been selected for an all-star game, and a perceived lack of morale among players. (#1 exh. 1.) The memorandum did not include allegations of abuse. (*Id*.)  The group posted instructions for petitioning the school to alert officials to their concerns, and to request a new coach. (*Id*.)  The memorandum also sought the removal of the girls' head basketball coach. (*Id*. exh. 1 at 3.)

2.) Manchester told Connors about the parents' concerns. (*Id*. at 2-3.) Manchester says that Connors was "defensive, but ... reasonable." (*Id*. at 4.) Connors explained that the money issue was the result of a failed order for warm-up gear, and that he planned to return the money to the players. (*Id*. at 3.)

At his deposition, Manchester summarized the conversation about the alleged abuse as follows:

> I said, "and then there's an allegation that you hit a player during a game." And he just, you know, he looked stunned at me and he said, "That's ridiculous," or something like that.... And I said, "I didn't see it. I'm just relaying what I've heard."[6]

(*Id*. at 3 & exh. 1 at 67.)

Plaintiff states that Connors denied and was shocked at the abuse allegations, and asked questions about them. (*Id*. at 4.) Manchester refused to tell him the name of the complaining parent and told him that he did not know the name of the student who was allegedly hit. (*Id*.) According to Manchester, he then said the following to Connors:

> I told him that this parent group was an angry mob, and again, that I was not part of it and that, you know, I felt that if he was to step down from basketball, then they would probably go away and he would salvage his career. Otherwise, if they continued forward and were able to prove these allegations that he could lose everything. He could lose his gym-teaching job, his football job.... And call me crazy, I thought I was doing him a favor by sharing this with him.
>
> *    *    *
>
> I just remember saying that, yeah, if they continue pushing forward with this and can prove that those allegations are true, you're going to lose everything.
>
> *    *    *
>
> I said, "And then the final allegation that's the most troubling, if it's true, is this, that you hit a player during a game and parents witnessed it."... I said, "My advice would be that if you stepped down from being the basketball coach that I would suspect this

---

[6] At deposition, Manchester stated that the alleged hitting incident occurred in 2010 or 2011. (#38 exh. 1 at 68-69.) No complaint was made at the time, and the purported hitting apparently was not reported by a referee or other game official. (*Id*.) Manchester stated that a parent, George Lay, gave him more details of the alleged abuse, telling him that "there was a time out ... where Thom Connors was getting all fired up and the players came down and they sat on the bench and he went and cuffed the guy [not Lay's son] on the side of the head, jolted his head.... And ... all the parents were literally gasped [sic]." (*Id*. exh. 1 at 67-68.)

parent group will, basically, back off." ... I said, "If they continue forward, you know, pursuing all these allegations and they're proven true," I said, "You could lose your job."

(*Id*. exh. 1 at 72, 97-98.) Manchester stated that he told Connors that a newspaper "had called the group. They [other parents] had told me that the newspaper had called and was asking questions." (*Id*. exh. 1 at 103.) Manchester states that, at the conclusion of the meeting, Connors said, "I'm the basketball coach until somebody tells me different," shook his hand, and said, "I want to thank you for coming in here and not hiding behind the website." (*Id*. exh. 1 at 72, 103-04.)

Immediately following the encounter, Connors drafted and submitted to the school administration a written statement about his meeting with Manchester. (#1 exh. 2.) In Connors' written statement, Manchester had not given him "advice" about what might happen if other parents "went public" with accusations, rather, Manchester was part of the parent group accusing him. Connors wrote that Manchester had said to him, "this is where it could get ugly if this comes out that I hit a player during a game that everyone saw it [sic], players and parents witnessed it...". (*Id*.) "He went on to say that 'you know, and it's up to you, but this can all go away and we won't go public with this and it could get ugly, if you are willing to step down as the basketball coach.'" (*Id*.) Connors also wrote that Manchester told him the group did not want him to lose his football and teaching positions at the school, and only wanted him to step down as basketball coach. (*Id*.) He stated that Manchester referred to the allegations as "ammunition" that could be used against Connors, and warned that they might be revealed to the public in a newspaper article or otherwise if Connors chose not to step down. (*Id*.)

Connors spoke with McAndrews. (#38 at 6-8.) Connors explained that he had kept the players' money after the warm-up gear deal fell through while he looked for another vendor. (*Id*. at

6 & exh. 2 at 8, 24.) He denied hitting any players. (*Id*. exh. 2 at 36-42.) At her deposition, McAndrews stated that, from this conversation with Connors, she believed that Manchester's comments to Connors about publicity and losing his job constituted threats. (*Id*. exh. 2 at 51-55.)

On April 14, 2011, McAndrews contacted Detective Robert Wile of the Amesbury police to report the situation. (#1 at 4; #7 at 4.) Wile was a police department-school liaison. (#38 at 7.) The Amesbury High School administration is obligated to report to the police any potential criminal offense, including one perpetrated by a staff member against a student. (*Id*. at 9-10 & exh. 2 at 8, 24, 51-55.) McAndrews reported the details of the meeting between Connors and Manchester, as they had been relayed to her by Connors. (#1 at 4; #38 at 7.) Wile was particularly concerned about the allegations of stolen money and of assault, as well as the perceived threats made by Manchester. (*Id*. at 7-8; #1 exh. 3.) McAndrews also told Wile that some parents wanted to have a meeting to discuss changing the coaching staff. (*Id*.) Wile and McAndrews discussed how to best handle the situation. (*Id*. at 4.)

On April 15, 2011, Wile spoke with Connors, who denied the accusations that he had hit a student and stolen money. (#38 at 8.) Wile wrote a report in which he stated that Connors told him that when he and Manchester met, Manchester accused him of hitting players during games and taking money from players and not giving it back. Manchester told Connors that if it "got out" that he assaulted players it "would hurt him." (#1 exh. 3.) Manchester "went on to tell [Connors] that if he stepped down as the coach of the basketball team that 'we' will not go public with mentioned [sic] accusations, which could hurt his career." (*Id.*)

Wile then contacted Manchester by telephone to discuss the matter. (#1 at 4; #7 at 3.) Wile asked for the names of other parents associated with Restore Amesbury Hoops, and about the abuse

allegations.  Manchester told him that he had never witnessed the alleged abuse, and did not know the name of the student who was hit. (*Id*.; #1 exh. 3.)  In his report, Detective Wile stated that Manchester denied having anything to do with the possibility of information going to a newspaper. (*Id*.)  Manchester admitted, however, to telling Connors that he could potentially lose everything if the group kept pushing. (#38 at 5.) Wile told Manchester that he would continue to investigate the situation, explained what charges Connors could face if the allegations were proven correct, and told Manchester that extortion charges against him were a possibility, as well, because of the threats he had made. (#1 at 4; #38 exh. 3 at 19-21.)

At his deposition, Wile explained why he said that extortion charges against Manchester were a possibility:

> [W]hat was given me is that he told [Connors] that "if you give up your position on the basketball team, we won't go forward." ... And then he said, "you know, we're not going to [sic], you can keep your football job and your Phys Ed job, but the basketball job, you're going to give up. If you don't, then we're going to go to the newspaper."
>
> To me, if you're going to go after someone like that on false allegations to step down and they're going to lose any type of money and especially given the nature of what was said was done [sic], it's extortion.

(*Id*. exh. 3 at 20-21.) Wile described Manchester's attitude during the conversation as "sarcastic," and Manchester referred to Wile's demeanor as "accusatory." (*Id*. exh. 1 at 77, exh. 3 at 20.)

After speaking with Manchester, Wile called the parents who had contacted McAndrews for a meeting. (#41 at 3.) In his report, he stated that "[o]ne of the members, Gina Crocker, said she heard third party of a possible hit but she could not remember who said it and again she said it was only third party information." (*Id*. at 3 & exh. 2.)

Connors wrote a statement to Detective Wile dated April 19, 2011 in which he addressed the money issue in detail. (*Id*. at 4 & exh. 2, exh. 7.)  Connors explained that he had collected $30 from the students for warm-up jackets, but had problems with the company from which he intended to order the jackets.  He stated that at the time of writing the explanation, he had returned the money to all the students save one, who no longer attended the school. (*Id*. exh. 7.)

On April 26, 2011, McAndrews and Wile met with the players on the varsity basketball team, as well as some members of the junior varsity team, to discuss the allegations that Connors hit a player.  (#38 at 7; #41 at 4.) They spoke with each member of the varsity basketball team individually, all of whom stated that they were never hit or witnessed any other player being hit by Connors. (#41 at 4 & exh. 2, 5.)  A few players, however, mentioned receiving or witnessing Connors give players "smarten up" or "good job" "dope slaps." (*Id*. at 5-6.)  Players also acknowledged that Connors held onto the money for the warm-up gear for months before returning it. (#41 exh. 5 at 47-48.) Wile reported that, based on his experience, he believed that the players were speaking truthfully. (*Id*. at 5 & exh. 2 at 3.)

On May 5, 2011, McAndrews met with Manchester. (#38 at 6 & exh. 2 at 49-50; #1 exh. 5.) At the meeting, Manchester reportedly complained about the Amesbury High School basketball program and the competence and performance of both Connors and the girls' basketball coach, and stated that those coaches should be replaced. (*Id*.) McAndrews asked for the name of the student who was allegedly hit, but Manchester stated that he did not know. (*Id*.) Manchester also refused to divulge the name of the parent who complained about abuse. (*Id*.)  Manchester told McAndrews that the administration might soon be looking for a replacement for Connors. (#38 at 7 & exh. 2 at

51-52; #41 at 9.)  McAndrews recalls that Manchester said that, if Connors did not step down as basketball coach, then Connors would "regret" it. (#38 exh. 2 at 52-53.)

Wiles authored a police report in which he stated:

Since the meeting on 4/13/11 Coach Connors['] life has been focused on the allegation lodged against him by Mr. Manchester. These allegations have taken a toll on both him and his family because some of this information was put on a web petition and gone [sic] out to the public. This has become the topic of a lot of his conversation and I clearly saw that it has affected his son.

*   *   *

Coach Connors worried throughout this investigation (and is still worried) about these allegations being published in the paper and hurting his reputation. Not only would he lose what he has built over the years, he is in fear that he would lose his coaching position which in turn would hurt him financially.

(#1 exh. 3.)

Wile concluded his report:

At the completion of this investigation I will be seeking a complaint from the Newburyport District Court to be issued against John Manchester of Fern Ave in Amesbury. The first charge will be Extortion Ch. 265 s. 25, this charge will stem from the conversations that Mr. Manchester was said to have had with Coach Connors on 4/13/11, and with Ms. McAndrews on 5/ 5/ 11, when he made allegations that Coach Connors was said to have hit a player (witnessed by a parent) and took money from the players for warm ups and not returning it. These allegations were going to go to the newspaper according to Mr. Manchester, unless Coach Connors stepped down. These allegations also caused undo [sic] stress to Coach Connors.

[*   *   *]

The second charge will be attempting to commit a crime: to wit Extortion.

In addition to the above charges this detective will aslo [sic] be seeking an additional charge of Intimidation of a witness. This charge will stem from the the [sic] conversation he had with Ms. McAndrews and her staff on 05/05/11 when Mr. Manchester told them they will be looking for a new basketball coach, football coach and gym teacher if he goes forward with the allegations. According to Ms. McAndrews when she told Coach Connors about the meeting he got someone to cover his classes for the day and went home because of the stress that was being placed on him by the allegations. Mr. Manchester knew there was a criminal investigation ongoing and still made the malicious accusations against Coach Connors threatening his livelihood.

(*Id.*)

On May 6, 2011, a criminal complaint was filed in the Newburyport District Court, charging Manchester with "extortion by false report of crime," in violation of Mass. Gen. Laws ch. 265, § 25, committed on April 13, 2011; threatening to commit a crime, to wit, extortion,  in violation of Mass. Gen. Laws ch. 275, § 2, committed on April 13, 2011; and intimidation of a witness, in violation of Mass. Gen. Laws ch. 268, § 13B, committed on May 5, 2011. (#1 exh. 7.)   Manchester was arraigned on May 16, 2011. (*Id.* at 6; #7 at 4.)

On June 22, 2011, an article appeared on an Amesbury local news website, addressing the case against Manchester. (*Id.*) The article also discussed Manchester's complaints about Connors, and the investigation of those complaints. (*Id.*) The article quotes Wile as saying, "He [presumably Manchester] needs to pay for the emotional stress he has put on Coach Connors.... You just don't do that.  If you have a concern over a coach, there is a process." (*Id.*)

In April 2012, in the Newburyport District Court, the extortion charge against Manchester was nol prossed, and the threat and intimidation charges were dismissed on Manchester's motion. (#38 exh. 6.)[7]   Plaintiff filed this lawsuit on August 16, 2013.

II.    <u>STANDARD OF REVIEW FOR SUMMARY JUDGMENT</u>

The purpose of summary judgment is "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Rojas-Ithier v. Sociedad*

---

[7]   Manchester's Motion to Dismiss the complaints in the Newburyport District Court was not included in any of the papers filed by the parties in this case.  Judge Doyle's Order of Dismissal for the threat and intimidation charges, which was included, contains a cryptic, handwritten notation that the Commonwealth "has not filed a memorandum in support of its position and cannot cite any law in opposition to the defendant's motion.  It is unclear from the facts what the target crime of the threat was or what conduct constituted intimidation of a witness.  In addition, one complainant did not sign on the complaint. Com[monwealth] concedes that this is a second hurdle/prong that they cannot get over." (#38 exh. 6.)

*Espanola de Auxilio Mutuo y Beneficiencia de P.R.*, 394 F.3d 40, 42 (1st Cir. 2005) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992)). When considering a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "'Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.'" *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (quoting *Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). Instead, "the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (citing *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)). The Federal Rules "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *accord Rojas-Ithier*,

12

394 F.3d at 42. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

III.   DISCUSSION

A. *The Federal Claims under 42 U.S.C. § 1983- Counts I-IV.*

Title 42 U.S.C. § 1983 "'supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law.'"  *Mead v. Independence Ass'n*, 684 F.3d 226, 231 (1st Cir. 2012) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011)).  Section 1983 "'is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.'"  *Davis v. Rennie*, 264 F.3d 86, 97 (1st Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)).

1. *Counts I and II.*

In Count I of the complaint, Manchester charges that Defendants "individually and as a group"[8] attempted to prevent him from exercising his First Amendment rights of "redress and petition" concerning "the behavior and employment status" of Connors, and that attempts to petition the municipal authorities were suppressed by criminal charges being brought against Manchester "without probable cause of any kind."  (#1 at 7.)  Count II alleges a violation of Manchester's First Amendment right of expression for the same reason.  (*Id*. at 8.)

---

[8]
Manchester has sued McAndrews, Connors, and Wile in their "individual and official" capacities. (#1 at 1.)  A state official acting in his or her official capacity cannot be sued for damages in a § 1983 action. *Fantini v. Salem State College*, 557 F.3d 22, 33 (1st Cir. 2009); *Wang v. New Hampshire Bd. of Registration in Medicine*, 55 F.3d 698, 700-01 (1st Cir.1995).  Thus, these three defendants may only be sued in their individual capacities. *Powell v. Alexander*, 391 F.3d 1, 23-23 (1st Cir. 2004).

"The elements of a common-law cause of action in Massachusetts for malicious prosecution are: (1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (quoting *Correllas v. Viveiros*, 410 Mass. 314 (1991)).  To make out a malicious prosecution charge under § 1983, the plaintiff must in addition show a deprivation of a federally-protected right. *Id*.

Here, all claims fail because there was probable cause for the charges against Manchester. The probable cause standard presents "a 'relatively low threshold' for police officers to establish." *Sietins v. Joseph*, 238 F. Supp. 2d 366, 375 (D. Mass. 2003) (citing *White v. Town of Marblehead*, 989 F. Supp. 345, 349 (D. Mass.1997); *Morrissey v. Town of Agawam*, 883 F. Supp. 2d 300, 311 (D. Mass. 2012).  "The standard of probable cause to authorize a criminal complaint is the same as the standard that governs the grand jury's decision to indict," which is, "sufficient evidence to establish the identity of the accused and probable cause to arrest him." *Commonwealth v. Bell*, 981 N.E.2d 200, 202 (Mass. App. Ct. 2013). "All that is required is 'reasonably trustworthy information...sufficient to warrant a prudent man in believing that the defendant had committed...an offense.'" *Id*. (quoting *Commonwealth v. O'Dell*, 466 N.E.2d 828 (Mass. 1984)).  Probable cause turns on "whether the defendant acted reasonably in swearing out a complaint against the plaintiff on the basis of the information and knowledge which he possessed at that time." *Lincoln v. Shea*, 277 N.E.2d 699, 702 (Mass. 1972).  As explained by the United States Supreme Court, "[p]robable cause exists where the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable

caution in the belief that an offense has been or is being committed." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (internal quotation marks and citations omitted).  Finally, "[i]n evaluating probable cause, a court 'look[s] at the objective facts, not at the actors' subjective intent.'" *United States v. Silva*, 742 F.3d 1, 8 (1st Cir. 2014)(quoting *United States v. Sanchez*, 612 F.3d 1, 6 (1st Cir. 2010)); *United States v. Monell*, _F.3d _, 2015 WL 5138183, at *4 (1st Cir. Sept. 2, 2015).

The complaint charges "extortion by false report of crime c. 265 § 25," committed on April 13, 2011, the date that Manchester met with Connors.[9]  (#1 at 2 and exh. 7.)  Mass. Gen. Laws ch. 265, § 25, titled "Attempted extortion," provides:

> Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offence, or by a verbal or written or printed communication maliciously threatens an injury to the person or property of another, or any police officer or person having the powers of a police officer, or any officer, or employee of any licensing authority who verbally or by written or printed communication maliciously and unlawfully uses or threatens to use against another the power or authority vested in him, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished by imprisonment in the state prison for not more than fifteen years, or in the house of correction for not more than two and one half years, or by a fine of not more than five thousand dollars, or both.

The elements of the crime are: (1) a malicious threat (2) made to a named person (3) to accuse someone of a crime or to injure someone's person or property (4) with intent to compel a person to do an act against his will.  *Commonwealth v. Miller*, 432 N.E.2d 463, 467 (Mass. 1982). "[T]he emphasis in the crime of extortion is on the wrongful use of fear to compel the victim to surrender something of value to the extortionist." *Id*.  A threat to expose another to disgrace and to

---

[9]

Curiously, the complaint refers to the crime as "extortion by false report," but the actual statute is called "Attempted extortion." As discussed *infra*, the statute does not require proof that the "report" the perpetrator threatens to make be false.

injure his reputation is "an injury to the person" under the statute. *Id*. The definition of malice in Massachusetts jurisprudence is "[t]he wilful doing of an unlawful act without excuse." *Commonwealth v. Lamothe*, 179 N.E.2d 245, 247 (Mass.1961) (internal quotation marks and citation omitted). A "threat" does not have to threaten violence or put the victim in fear. In *Commonwealth v. Cacchiotti*, the Massachusetts Appeals Court found that the defendant, an attorney who was court-appointed counsel for the victim, made a "threat" under ch. 265 § 25 when he asked his client's family for a fee to seek a bail reduction. The Court held that "there was evidence from which the jury could have concluded that defendant accepted $1,500 in return for seeking a bail reduction and that, by seeking and accepting a fee for so doing, he used his power and authority as appointed counsel to extort money for seeking his client's freedom...". The Court further explained:

> 'In analyzing whether a threat is made, we do not parse the words alone, *Commonwealth v. Sholley*, [432 Mass. 721, 725, 739 N.E.2d 236 (2000), *cert. denied*, 532 U.S. 980, 121 S.Ct. 1621, 149 L.Ed.2d 484 (2001)], nor do we draw distinctions between express and implied threats. Rather, we 'consider the context in which the allegedly threatening statement was made and all of the surrounding circumstances' to determine whether the statement was a threat. *Ibid*. Demeanor and tone play a part, as does the personal history of the speaker, the relationship of the parties, and the timing, subject matter, location, and other conditions of the exchange.'

*Commonwealth v. Cacchiotti*, 772 N.E.2d 591, 594 (Mass. App. Ct.), *rev. denied*, 437 Mass. 1110 (2002) (Table) (quoting *Commonwealth v. Gittens*, 769 N.E.2d 777, 783 (Mass. App. Ct. 2002)).

Plaintiff argues vigorously that because there was some evidence that Connors was guilty of hitting a player and stealing money from the players, there was no probable cause to charge Manchester, as if an element of the crime of attempted extortion is that the threatened accusations must be false. (#40 at 4-5.) This is not so. Surely, if someone threatened to accuse falsely a person of a crime unless that person gave up something of value, the fact that the accusation was false

would supply evidence to establish the "maliciousness" of the threat.  But the elements of the crime can be met even if the accusation is true.  If Connors had hit a student, for example, under the statute it would still be a criminal act for someone to threaten to make that crime public unless Connors gave up his job.  *Cf. Commonwealth v. DeVincent*, 266 N.E.2d 314 (Mass. 1971) (malicious threat of bodily injury criminal even though intended to force payment of just debt).  At any rate, even if the statute required that the accusations be false, Detective Wile investigated Connors' alleged crimes, and it seems that Connors adequately explained that he did not intend to steal money from the players, and the evidence concerning the assault on a player was minimal, at best.

Detective Wile authored a police report in which he related the April 13, 2011 conversation between Manchester and Connors.  He states that Manchester told Connors that he was being accused of taking money from the players (by taking money for warm-up suits and not returning it) and hitting a player during a game.  Manchester reportedly said that if Connors stepped down as basketball coach, he and the other parents would not "go public" with the accusations.  (#38 exh. 5 at 4-5.)

On this record, based on the facts as Connors related them to Detective Wile, there was evidence to support a finding of probable cause to charge Manchester with extortion.  According to the account that Detective Wile received from Connors, Manchester threatened to "go public" with accusations of crimes if Connors did not give up his job as basketball coach.   This constituted probable cause that Connors was threatened with unfavorable publicity about alleged crimes if he did not give up his job as basketball coach.  The threats were "malicious" under the statute because they conditioned the lack of publicity on Connor's doing something against his will.

The fact that Manchester denied making these precise statements to Connors, and that Wile knew that Manchester had denied making the statements, does not matter in the circumstances here. Manchester conceded that the conversation occurred. He denied making specific statements, (such as saying that he himself was going to go to the press about the alleged crimes), but Manchester admitted that the many of the details of the conversation as related by Connors were true. Detective Wile was within the law to seek a complaint, even though there were conflicting accounts of what happened. Police officers are not obligated to investigate potential defenses before finding probable cause. *See Holder v. Sandown*, 585 F.3d 500, 505 (1st Cir. 2009) (officer may terminate investigation when he accumulates facts that demonstrate probable cause); *Chapman v. Finnegan*, 950 F. Supp. 2d 285, 296 (D. Mass. 2013) (when faced with conflicting accounts from parties, officers need not make definite credibility judgments, rather, question is whether there was reasonable basis for officers' finding probable cause.). "The test for probable cause 'does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable.'" *Acosta v. Ames Department Store*, 386 F.3d 5, 11 (1st Cir. 2004) (quoting *United States v. Winchenback*, 197 F.3d 548, 555-56 (1st Cir. 1999)).

Manchester was also charged with threatening to commit a crime, extortion, during his conversation with Connors. (#1 exh. 7.) The statute provides,

> If complaint is made to any such court or justice that a person has threatened to commit a crime against the person or property of another, such court or justice shall examine the complainant and any witnesses who may be produced, on oath, reduce the complaint to writing and cause it to be subscribed by the complainant.

Mass. Gen. Laws ch. 275, § 2. "The elements of threatening a crime include an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." *Commonwealth v. Hamilton,* 945 N.E.2d 877,

881 (Mass. 2011) (quoting *Commonwealth v. Sholley*, 739 N.E.2d 236, 240 (Mass. 2000), *cert. denied*, 532 U.S. 980 (2001)).   "[T]he expression may contain an explicit or implicit threat." *Felix F. v. Commonwealth*, 31 N.E.3d 42, 46 (Mass. 2015).   "The assessment whether the [accused] made a threat is not confined to a technical analysis of the precise words uttered." *Commonwealth v. Sholley*, 739 N.E.2d 236, 240 (Mass. 2000), *cert. denied*, 532 U.S. 980 (2001).

In this case, the same evidence that supports the attempted extortion charge supports a charge of threat to commit extortion.   According to his version of events, Connors had reason to fear that the threat could be carried out, as  Manchester (i) appeared to be speaking on behalf of a parent group, (ii) told Connors that there was a good chance he could lose all three of his jobs if he did not step down as basketball coach, (iii) stated that a newspaper was asking questions, and (iv) told Connors that he stood "to lose everything." (#38 at 67, 72, 97-98, 103.)   In short, there was probable cause to charge Manchester with threatening to commit extortion if Connors did not step down as basketball coach.

Finally, Manchester was charged with intimidating a witness, (the witness being Connors) on May 5, 2011, in connection with his meeting with McAndrews on that date. (#1 exh. 7; #38 exh. 5 at 6.)   The statute provides that "[w]hoever, directly or indirectly, willfully ... (a) threatens, or attempts or causes physical injury, emotional injury, economic injury or property damage to; [or] (c) misleads, intimidates or harasses another person who is ... (i) a witness or potential witness at any stage of a criminal investigation... [or] (iv) a person who is furthering a civil or criminal proceeding, including criminal investigation, ... shall be punished by imprisonment..." Mass. Gen. Laws ch. 268, §13B.   With regard to witness intimidation, "the defendant's 'subjective intent is not relevant.'" *Commonwealth v. Cohen*, 921 N.E.2d 906, 930 (Mass. 2010) (quoting *Commonwealth v. Gordon*,

694 N.E.2d 2, 4 (1998)).   It is sufficient that a reasonable fact finder could  infer from the circumstances that the defendant did, indeed, intimidate the witness.  Additionally, an action does not need to be overtly threatening to fall within the meaning of  intimidation. *Id.*

McAndrews made a record of her conversation with Manchester in a report that she gave to Detective Wile.  In her report, she states that Manchester said the allegations against Coach Conners were "serious;" Manchester was glad there was a police investigation into the allegation that Conners had hit a player; and he said that "when this  hits the paper," the administration would be looking for "a new basketball coach, a new football coach, and a new gym teacher." (#38 exh. 5 at 7.) Manchester's comments make clear that he was aware that McAndrews and the police department were investigating the allegations he had made during his April 13 meeting with Connors.  (#38 exh. 3 at 19-21.)  In light of the previous conversation that Manchester had with Connors, the repetition of practically the same threats to "go public" with accusations, actions that would cause Conners to lose his job, was enough to constitute probable cause for the crime of intimidation of Conners.  It was not necessary that Manchester speak directly to Connors; it was enough that he knew McAndrews would communicate his words to Connors, which she did.  *Commonwealth v. Valentin*, 982 N.E.2d 544, 546 (Mass.App.Ct. 2013).   Viewed objectively, these facts support a finding that there was probable cause to charge Manchester with intimidating a witness.

The evidence here shows no genuine issue of material fact that Detective Wile had probable cause to bring the charges against Manchester. Plaintiff claims that his rights were violated solely through actions threatened and taken without probable cause. (#1 at 7-8.) Consequently, because the evidence shows that there was probable cause to take those actions, there is no genuine issue of material fact that would allow this case to go forward on Plaintiff's constitutional claims.

2. *Claims against the City of Amesbury.*

Because there were no constitutional violations, as set out above, the claims against the City of Amesbury fail.  There is an additional reason, however, why the suit against the City fails: Manchester provides no details in the complaint relating to the town's liability.  In his response to defendants' motion for summary judgment, Manchester claims that "in their response to the complaints of parents," by "requesting a police investigation into the contents of a web page, postponing, avoiding or preventing meetings with parents to address their concerns and encouraging an investigation of Manchester under the guise of an investigation into Thomas Connors the actions of Defendants Connors and McAndrews and their employer, City of Amesbury evidenced a pattern of behavior or policy.... The purpose of the pattern or policy was to prevent and eliminate dissent." (#39 at 3.)   This statement does not adequately set out any pattern or policy of the City.

A municipality is not liable for the actions of its employees simply by virtue of the employment relationship.  *See Monell v. New York City Dept. Of Social Services*, 426 U.S. 658 (1978) (city can be found liable under § 1983 only where city itself causes constitutional violation at issue because of policy or custom);  *Chapman v. Finnegan*, 950 F. Supp. 2d 285, 293  (D. Mass. 2013) (setting out case law on liability of municipalities under § 1983).   "Under § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008); *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013); *Kennedy v. Town of Billerica,* 617 F.3d 520, 531-32 (1st Cir. 2010) (municipal liability may be imposed "only for underlying, identifiable constitutional violations attributable to official municipal policy; the municipality's failure to train or supervise its police officers only becomes a basis for liability when action pursuant to official municipal policy

of some nature caused a constitutional tort." (internal citation and quotation marks omitted)).  In sum, in order to succeed in a § 1983 action against a municipality, plaintiffs

> must prove that 'action pursuant to official municipal policy' caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.

*Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1359 (2011) (internal citations omitted).  As Plaintiff offers no competent summary judgment evidence of a policy or custom in support of his claims, any claims against the City of Amesbury fail and the motion for summary judgment is allowed.

### 3. *Summary judgment is allowed as to Count III.*

Count III charges that Manchester's Fourth Amendment rights were violated by "the participation by all the Defendants in the attempt to create the appearance of probable cause for a complaint," alleging that "the intentional imposition of a criminal complaint, conditions of pretrial release, compulsory process necessary of a defense [sic] and the social and community implications [sic]" for Manchester and his family were an unreasonable seizure.  (*Id.*)

As set out above, as there is no constitutional violation, this Count fails.  It would fail anyway, however, because "the view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." *Nieves*, 241 F.3d at 55.  There is no evidence here that Manchester faced travel restrictions, was required to post a monetary bond, or was "otherwise exposed to any significant deprivation of liberty" to constitute a Fourth Amendment seizure.  *Id.* at 56. *See also Harrington v. City of Nashua,* 610 F.3d 24, 32-33 (1st Cir. 2010) (standard conditions of pretrial release do not rise to the level of a Fourth Amendment seizure).  Summary judgment is allowed as to Count III.

### 4. Summary judgment is allowed as to Count IV.

Count IV alleges a violation of due process under the Fourteenth Amendment because the "participation by all the Defendants in the attempt to create the appearance of probable cause for a complaint constitutes a violation of the 14th Amendment of the United States Constitution and a failure to provide due process" to Manchester. (#1 at 8.)  Count IV fails because there was no constitutional violation, and also because malicious prosecution claims cannot be based on violations of procedural or substantive due process.  "It is perfectly clear that the Due Process Clause cannot serve to ground the appellants' federal malicious prosecution claim.  No procedural due process claim can flourish in this soil because Massachusetts provides an adequate remedy for malicious prosecution."  *Nieves*, 241 F.3d at 53-54.  Similarly, the Supreme Court has held that "substantive due process may not furnish the constitutional peg on which to hang" a federal malicious prosecution tort.  *Albright v. Oliver*, 510 U.S. 266, 271 n.4 (1994).

On this record, there is no genuine issue of material fact on Plaintiff's First, Fourth, and Fourteenth Amendment claims. For that reason, summary judgment is warranted in favor of Defendants on Manchester's claims under the United States Constitution.

### B. *The State Law Claim - Impairment of Rights*

In his complaint, Plaintiff also alleges that his rights were violated under chapter 12, § 11I of the Massachusetts Civil Rights Act ("MCRA"). (#1 at 8-9.) Specifically, he contends that:

> The participation by all of the Defendants in a scheme to threaten, intimidate and coerce [him] for the purpose of preventing him and others from complaining about the personnel of the municipality and the school district constitutes a violation of the Plaintiff's statutory rights and his rights under the Massachusetts Declaration of Rights.

(*Id.*)

23

The relevant statute provides:

> Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court.

Mass. Gen. Laws ch. 12, § 11I. Section 11H provides, as follows:

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured. Said civil action shall be brought in the name of the commonwealth and shall be instituted either in the superior court for the county in which the conduct complained of occurred or in the superior court for the county in which the person whose conduct complained of resides or has his principal place of business.

*Id*. § 11H.

To succeed on a claim under the MCRA, a plaintiff must prove that:

> '(1) [his] exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference . . . was by threats, intimidation, or coercion.'

*Shea v. Porter*, 2013 WL 1339671, at *6 (D. Mass. Mar. 29, 2013) (quoting *Cryer v. Clarke*, 763 F.

Supp. 2d 237, 254 (D. Mass. 2010)); *Elwood v. Pina*, 815 F.2d 173, 177 (1st Cir. 1987) ("A person

states a claim under the Act upon showing (1) 'threats, intimidation or coercion' that (2) lead to a

violation of a federal or commonwealth constitutional right or statutory provision."); *Turkowitz v.*

*Town of Provincetown*, 914 F. Supp. 2d 62, 76 (D. Mass. 2012) ("To establish his claim under the

Massachusetts Civil Rights Act ("MCRA"), plaintiff must show 1) defendant officers threatened, intimidated or coerced him 2) to prevent him from exercising a constitutional right."). "The MCRA is the state analog to § 1983, and provides a cause of action for individuals whose rights under the constitution or laws of the United States or Commonwealth of Massachusetts have been interfered with by "threats, intimidation, or coercion." *Morse v. Commonwealth of Mass. Exec. Office of Public Safety Dep't of State Police*, ___ F. Supp. 3d ___, 2015 WL 4920027, at *9 (D. Mass. Aug. 18, 2015). Plaintiff's claim under the MCRA must fail because, as discussed earlier, there has been no showing that Manchester's constitutional or other rights were violated. Nor has Manchester demonstrated the existence of a genuine issue of material fact that the parties attempted to interfere with his rights using "threats, intimidation, or coercion." As a result, the entry of summary judgment in Defendants' favor is warranted on Plaintiff's state civil rights claim.

IV.     CONCLUSION

For the reasons set forth above, it is ORDERED that Defendants' Motion for Summary Judgment (#36.) be, and the same hereby is, ALLOWED.  Judgment shall enter for the Defendants.


                                        /s / M. Page Kelley_____
                                        M. Page Kelley
September 30, 2015                       United States Magistrate Judge